UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
THE CITY OF NEW YORK,

                Plaintiff,          <u>OPINION</u>

      -against-              09 Civ. 9224 (MGC)


TAVERN ON THE GREEN, L.P., and
LEROY ADVENTURES, INC.,

                Defendants.

----------------------------------X
TAVERN ON THE GREEN, L.P., and
LEROY ADVENTURES, INC.,

                Plaintiffs,

      -against-              09 Civ. 9254 (MGC)


NEW YORK CITY DEPARTMENT OF PARKS &
RECREATION,

                Defendant.

----------------------------------X


APPEARANCES:

        CORPORATION COUNSEL OF THE CITY OF NEW YORK
        Attorneys for the City of New York
        100 Church Street, Room 20-093
        New York, New York 10007
        By:  Gerald E. Singleton, Esq.
            Katherine Winningham, Esq.
            Gabriela P. Cacuci, Esq.

        LOCKE LORD BISSELL & LIDDELL LLP
        Attorneys for Debtors
        3 World Financial Center
        New York, New York 10281
        By:  David H.T. Kane, Esq.

Gregory T. Casamento, Esq.
Thomas L. Casagrande, Esq.
Emily J. Larrimer, Esq.

AKERMAN SENTERFITT, LLP
Attorneys for Debtors
335 Madison Avenue, Suite 2600
New York, New York 10017
By: Keith N. Costa, Esq.

DUVAL & STACHENFELD LLP
Attorneys for Creditors' Committee
101 Park Avenue, 11th Floor
New York, New York 10178
By: Norman N. Kinel, Esq.
    J. Andrew Stephenson, Esq.

**Cedarbaum, J.**

    This is a dispute over a name that has been used on a
restaurant in New York's Central Park since 1934.  The City of
New York (the "City") and Tavern on the Green, L.P. and LeRoy
Adventures, Inc. (collectively, the "Debtors") filed adversary
proceedings in the Debtors' jointly administered bankruptcy
case,[1] and sought summary judgment on their claims.  With the
permission of the bankruptcy judge, the Official Committee of
Unsecured Creditors intervened.  The City then filed a motion
pursuant to 28 U.S.C. § 157(d) to withdraw the reference to the
Bankruptcy Court of these adversary proceedings.  I granted the
City's motion to withdraw the reference in open court after

---

[1] <u>In re Tavern on the Green, L.P. and Leroy Adventures, Inc.</u>,
Case Nos. 09-15448 & 09-15450, Adv. Nos. 09-01538 & 09-01540
(Bankr. S.D.N.Y.).

hearing argument by the parties on December 1, 2009.  The parties have briefed and argued their motions for summary judgment, and have filed supplementary materials.

The City seeks a declaration of its prior right under New York law to use the "Tavern on the Green" name for its restaurant facility in Central Park.  The City also seeks cancellation of the Debtors' registered mark for restaurant services for fraud and falsely suggesting a connection with an institution.  In addition, the City petitions for cancellation of the Debtors' registration of "Tavern on the Green" for cooking oils.

The Debtors seek a declaration that they have the exclusive right to use the name "Tavern on the Green" for restaurant services and an injunction against the City's use of the name "Tavern on the Green" in commerce.

Both sides have moved for summary judgment on all claims. For the reasons that follow, the City's motion is granted in part and the Debtors' restaurant services mark is canceled for fraud. The City's motion is denied as premature with respect to the Debtors' oils mark.  The Debtors' motion is denied.

### THE UNDISPUTED FACTS

The material facts are undisputed.  The City owns premises located in Central Park near West 67th Street known since 1934 as "Tavern on the Green."  In 1934, then Parks Commissioner Robert Moses implemented a plan to convert a sheepfold, designed by

Jacob Wrey Mould and constructed in 1870, into a reasonably priced restaurant which he named "Tavern on the Green."  The City renovated the premises pursuant to Moses' plan, entered into an operations agreement with an outside concessionaire, and Mayor La Guardia formally opened the restaurant on October 21, 1934. Since 1934, "Tavern on the Green" has become a famous name associated in the public mind with a restaurant in a City building located in New York's Central Park.

The "Tavern on the Green" initially operated seasonally and could accommodate 300 patrons indoors and an additional 300 outside on the terrace.  The restaurant was operated by a succession of concessionaires, and closed periodically for renovations and improvements.  The initial concessionaire was Central Park Catering Co., which was succeeded in turn by Savarins Management, Inc., Arnold and Arthur Schleifer, and Julius Berman and Arthur Schleifer.  The restaurant was closed on several occasions for refurbishment, including a $400,000 renovation in 1956 that expanded the indoor seating to accommodate 720 guests.  The City paid for eighty percent of the 1956 renovation.

By 1962, when Restaurant Associates, Inc. was licensed to operate the "Tavern on the Green," it was described as a "million-dollar-a-year business" in the New York Times.

Restaurant Associates, Inc. operated the facility through
December 31, 1973.

**I.  The 1973 Agreement**

On December 20, 1973 the City and the Debtors entered into a
license agreement of limited duration (the "1973 Agreement") for
the operation of the "TAVERN-ON-THE-GREEN" as a "restaurant and
cabaret."  (1973 Agreement Preamble, §§ 1, 2(b).)  The 1973
Agreement was amended on July 8, 1976 (the "1976 Amendment"), and
remained in effect, as modified, until 1985.

The 1973 Agreement provides for the transition from
Restaurant Associates, Inc. to Debtors, and contemplates
substantial renovations to the "Tavern on the Green."[2]  The
"Tavern on the Green" reopened on August 31, 1976 after the
completion of those renovations, and was in continuous operation
until the 1985 Agreement expired.

The 1973 Agreement describes the grant to the Debtors as a
"license," and the preamble states that the "[Parks]
Administrator desires to provide certain services and facilities
for the accommodation of the public, and Licensee desires [to]
operate and maintain same."  (1973 Agreement Preamble, § 1.)

_____

[2] The 1976 Amendment changes the term of the license and payments
to the City in light of delays related to the renovation of the
"Tavern on the Green," and also requires the City to consider
"the extent to which Licensee has made the TAVERN-ON-THE-GREEN
successful from a financial point of view while charging
reasonable rates" in awarding the succeeding license to the
restaurant.  (1976 Amendment § 2.)

With respect to the use of the trade name "Tavern on the Green," the agreement grants "permission to Licensee to change the name of the licensed premises provided that Licensee obtains Administrator's written approval of the new name proposed by Licensee and Administrator agrees not to withhold such approval unreasonably." (1973 Agreement § 23.) It is undisputed that the Debtors never sought permission to change the long established and famous name of the restaurant.

The 1973 Agreement also establishes a variety of rights and obligations with respect to the operation of the facility. For example, the manager employed must be satisfactory to the City; there must be a sufficient number of trained attendants; and the attendants must wear a City-approved uniform.

## II. The 1985 Agreement

On May 16, 1985 the City and Debtors entered into a new agreement (the "1985 Agreement"). The 1985 Agreement is styled a "License Agreement," and contains preamble language similar to the 1973 Agreement. Unlike the 1973 Agreement, however, the 1985 Agreement contains no provision that would permit the licensee to change the name of the licensed premises.

The 1985 Agreement also alters the license fee structure, and requires Warner LeRoy "to supervise the operations of the Licensee to the best of his ability[.]" (1985 Agreement Art. 4(b).) As in the 1973 Agreement, the 1985 Agreement creates a

variety of rights and obligations with respect to the operation of the facility.  For example, the right of the City to regulate the times and manner of operation; the City's right of inspection at all times; the requirement of City approval regarding the "use of signs or any other means of soliciting business" (1985 Agreement Art. 19.); the Debtors warrant that the food sold will be "pure and of good quality" (1985 Agreement Art. 18.); and the City retains the right to terminate the license under numerous conditions, including unsatisfactory operations.

The City frequently exercised its right to regulate the hours of operation and the events that could be held at the "Tavern on the Green" through letters and visits by City representatives.

## III.  The Federal Marks

In August of 1978, Warner LeRoy applied, on behalf of a joint venture, to register the name "Tavern on the Green" with the United States Patent and Trademark Office (the "PTO") for restaurant services.[3]  The application claimed a first use in commerce at least as early as August 31, 1976, and LeRoy further represented that:

---

[3] The joint venture was comprised of Debtor LeRoy Adventures, Inc. and Hardwicke's Tavern L.P.  The joint venture conveyed its interest in the mark to Debtor LeRoy Adventures, Inc. in 1986, which assigned its interest in turn to Debtor Tavern on the Green, L.P. in 1997.

> "[H]e believes said joint venture to be the owner of
> the mark sought to be registered; to the best of his
> knowledge and belief no other person, firm, corporation
> or association has the right to use said mark in
> commerce, either in the identical form or in such near
> resemblance thereto as to be likely . . . to cause
> confusion, to cause mistake, or to deceive[.]"

(Application Oath at 1-2.)  LeRoy did not disclose the 1973
Agreement to the PTO.  Nor did LeRoy disclose to the City that he
had applied to register the name "Tavern on the Green" as his
trademark.  The PTO approved the mark for publication, and notice
of publication was given on February 17, 1981.  Without
opposition, the name "Tavern on the Green" was registered as a
service mark on May 12, 1981 (Reg. No. 1,154,270).

In 1986, the Debtors filed an affidavit with the PTO
swearing that the mark had been in continuous use for more than
five consecutive years from issuance.  The PTO accepted the
affidavit, and the mark for restaurant services became
"incontestable" pursuant to 15 U.S.C. § 1065.

In a letter of June 6, 2006, the City stated that it had
recently come to its attention that the Debtors had obtained a
federal registration for "Tavern on the Green" for restaurant
services, and requested that Debtors assign all rights in the
mark to the City.  The Debtors disputed the City's claim of
ownership of the restaurant services mark in subsequent
correspondence.

8

In April of 2007, the Debtors filed an application to register the name "Tavern on the Green" for cooking oils, salad dressings, and dipping oils.  The PTO approved the mark for publication in March of 2008, and the City filed two requests for extension of time to oppose the registration.  The City did not file an opposition proceeding, and a trademark for oils was registered on September 2, 2008 (Reg. No. 3,494,658).

## IV.  Recent Events

In September of 2009, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  The cases are being jointly administered by that court.[4]

In anticipation of the terminal date of Debtors' license, the City sought bids to operate a restaurant at the "Tavern on the Green," and has selected another party to operate the concession beginning in 2010.

## DISCUSSION

Summary judgment should be granted if the court determines that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A genuine issue of material fact exists when the evidence is such that a

---

[4] The Debtors have indicated that they intend to assign their service mark for "Tavern on the Green" to the highest bidder at auction.  While the question of whether this would amount to an assignment in gross is not presented here, I note that it is well established that any assignment of naked trademarks apart from the goodwill of a business is invalid.  See, e.g., Pilates, Inc. v. Current Concepts, Inc., 120 F. Supp. 2d 286, 310-11 (S.D.N.Y. 2000).

reasonable finder of fact could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether a genuine issue exists, the court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  <u>Dallas Aero., Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 780 (2d Cir. 2003).

The same standard of review applies where opposing parties move for summary judgment.  <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001).  The court must draw all reasonable inferences against the party whose motion is under consideration. <u>Id.</u>  Because summary judgment is granted in part to the City, all reasonable inferences have been drawn in favor of the Debtors.

**I.  The Debtors' "Incontestable" Restaurant Services Mark**

The Debtors argue that their mark is "incontestable" pursuant to Section 1065 of Title 15, and that they are entitled to a declaration of their exclusive right to use the mark for restaurant services and an injunction against the City's use of the trade name "Tavern on the Green."

Section 1065 provides for the incontestability of a registered mark upon the filing of an affidavit of five years of continuous use, with limited exceptions.  The statute provides:

> "Except on a ground for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable . . . ."

15 U.S.C. § 1065 (2006).  Because Debtors filed an affidavit attesting to the continuous use of the restaurant services mark for more than five years, the mark is "incontestable" unless one of the statutory exceptions applies.

The City contends that three exceptions to statutory incontestability apply in this case.  First, the City argues that the Debtors' restaurant services mark infringes the City's prior right to the trade name "Tavern on the Green" under New York law. Second, the City contends that the registration for the Debtors'

restaurant services mark was obtained fraudulently, which is
grounds for cancellation under Section 1064(3).  Third, the City
asserts that the restaurant services mark falsely suggests a
connection with an institution, which is grounds for cancellation
under Sections 1064(3) and 1052(a).

## II.  The City's Claim of a Prior Right

To establish the City's prior right to the trade name

"Tavern on the Green," the undisputed facts must show that the

City has a valid right acquired under New York law by use of the

"Tavern on the Green" mark continuing from a date prior to the

Debtors' 1981 registration.  15 U.S.C. § 1065; see Cuban Cigar

Brands N.V. v. Upmann Int'l, Inc., 457 F. Supp. 1090, 1100 & n.43

(S.D.N.Y. 1978) (Weinfeld, J.) ("[T]o come within the exception

under this section, a party must show (1) that its use of the

mark began before its adversary's mark was registered and

published, and (2) there has been continuing use since that

time." (citing Casual Corner Assocs., Inc. v. Casual Stores of

Nev., Inc., 493 F.2d 709 (9th Cir. 1974))).

### A.  Prior Right Under New York Law

The Second Circuit has said that "New York's law of unfair

competition encompasses claims for infringement of an

unregistered trade name or trademark."  815 Tonawanda St. Corp.

v. Fay's Drug Co., Inc., 842 F.2d 643, 649 (2d Cir. 1988).  In

order to establish a protectible right to a trade name under New

York law, the City must proffer undisputed facts that show that

the defendants are unfairly attempting to exploit the efforts of

another to create goodwill in that trade name.  See id.; Allied

11

Maint. Corp. v. Allied Mech. Trades, Inc., 42 N.Y.2d 538, 542 &
n.2, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977).

In a dispute regarding the name Fraunces Tavern, the New
York Court of Appeals held that the lessor of premises known by
that name since the eighteenth century had a right to the name
superior to the registered service mark of the lessee, because
without the permission of the lessor the lessee could not have
used it.  Norden Rest. Corp. v. Sons of the Revol. in the State
of N.Y., 51 N.Y.2d 518, 522-23, 434 N.Y.S.2d 967, 415 N.E.2d 956
(1980), cert. denied, 454 U.S. 825 (1981).  The lease required
the lessee to operate under the name Fraunces Tavern Restaurant
unless the lessor approved another name in writing, and provided
for the termination of the lessee's right to use that name at the
expiration of the lease.  Id.  Thus, although the lessee had
conducted a restaurant business on the premises for many years
and registered "Fraunces Tavern" with the PTO for restaurant
services, the Court found that the lessor had superior rights to
the name long associated with the premises.[5]  Id.

---

[5] This is consistent with the traditional view in New York that
the goodwill and rights to the name of a public building run with
the building.  See, e.g., Shubert v. Columbia Pictures Corp., 189
Misc. 734, 739, 72 N.Y.S.2d 851 (N.Y. Sup. Ct. 1947) ("[T]he good
will of a public building, such as a theatre or hotel, runs with
the building, and that good will passes with the lease of the
building to the lessee and cannot be severed therefrom even by
its first adopter and user.") (citations omitted), aff'd, 274
A.D. 751 (1st Dep't 1948).

The City has provided compelling evidence of a prior right to the name of its Central Park restaurant. As with the license in Norden Restaurant Corp., the 1973 Agreement for the operation by Debtors of a restaurant in the building in Central Park known as "Tavern on the Green" required the City's consent for the Debtors to change the restaurant's name from "Tavern on the Green." The 1973 Agreement also contains provisions for City oversight of the restaurant, and the 1976 Amendment requires the City to consider the extent to which the Debtors enhanced the success of the "Tavern on the Green" in awarding the succeeding license. The Agreement does not contain an explicit termination provision regarding the Debtors' right to use the name "Tavern on the Green," but this is not itself inconsistent with the Agreement's recognition of the City's interest in the restaurant and its name. The evidence shows that the City established the restaurant well over thirty-five years prior to the Debtors' use and registration. The City chose the name and each concessionaire and made significant investments to ensure the success of the restaurant -- such that "Tavern on the Green" was closely associated in the public mind with a building owned by the City and located in New York's Central Park.

The Debtors rely on the Ninth Circuit's decision in Department of Parks and Recreation v. Bazaar del Mundo Inc., 448 F.3d 1118 (9th Cir. 2006). However, the court in Bazaar did not

examine the question of prior rights under New York law, and the facts of that case are clearly distinguishable.  Most significantly, the State of California, which claimed prior common law rights to the names "Casa de Pico" and "Casa de Bandini" for restaurant services, had only used its historic buildings known by those names "to house shops" and promote tourism prior to entering into a 1971 concession agreement with Bazaar del Mundo to operate a "Mexican-Style Shopping Arcade." Bazaar, 448 F.3d at 1121-22.  In 1981, the parties executed an amended agreement which required Bazaar del Mundo to establish "Casa de Pico" and "Casa de Bandini" restaurants.  Id. at 1122. However, Bazaar del Mundo was already operating restaurants under those names at the time of the amendment.  Id.  The State had not previously used its buildings for restaurant services, and the concession agreement only referred to the "Casa de Pico" and "Casa de Bandini" restaurants after the concessionaire had first established them under those names.

Because the undisputed facts show that the City established and continuously maintained a restaurant under the name "Tavern on the Green" at the same location in New York's Central Park since 1934, the City has a protectible interest in that name under the law of New York.

### B.  Continuing Use

The undisputed facts also show the City's "continuing use" from a date long prior to the Debtors' registration of the restaurant services mark.  See 15 U.S.C. § 1065.  Courts have held that "continuing use" requires an "'unbroken continuum of use without significant interruption . . . .'"  Pilates, Inc., 120 F. Supp. 2d at 311-12 (quoting Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1354 (E.D.N.Y. 1994)); see also Cuban Cigar Brands, 457 F. Supp. at 1100 & n.43.

It is undisputed that the City established the "Tavern on the Green" restaurant in 1934.  The undisputed evidence also shows that the restaurant has been in operation ever since, except for closings related to periodic renovations.  The most recent renovation lasted from 1974-76, at the beginning of the Debtors' license.  The Debtors contend that closing for renovations breaks the City's chain of continuous use.  However, the Debtors have not cited a single case holding that periodic closings for renovation break the continuum of use of a trade name.  Renovations usually signify an intention to continue operations, which the 1973 Agreement makes clear by contemplating renovations in the transition from the prior licensee to the Debtors.  The City has established "continuing use" dating back

more than thirty-five years before the Debtors' 1981 registration of the mark.

Accordingly, the Debtors' registered mark for restaurant services is not incontestable as against the City, which has shown a prior right under New York law to the "Tavern on the Green" name for its historic restaurant in Central Park.

## III.  The City's Claim of Fraud

Both parties seek summary judgment on the City's motion for cancellation of the registration of the Debtors' restaurant services mark on the ground that it was obtained fraudulently. The standard of proof for fraud is clear and convincing evidence. See Ushodaya Enters., Ltd. V. V.R.S. Int'l, Inc., 63 F. Supp. 2d 329, 335 (S.D.N.Y. 1999).

In order to succeed on its petition for cancellation, the City must establish misstatements that "indicate a 'deliberate attempt to mislead the [PTO]'" and were "with respect to a material fact – one that would have affected the PTO's action on the application[]." Orient Express Trading Co., Ltd. v. Federated Dep't Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988) (citations omitted). An applicant's statements to the PTO must reflect "uncompromising candor." Id. The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark. See Angel Flight of Ga., Inc. v.

16

<u>Angel Flight Am., Inc.</u>, 522 F.3d 1200, 1210-11 (11th Cir. 2008)
("Purposely failing to disclose other users' rights to use the
same or similar marks may qualify as a material omission
justifying cancellation of a trademark.").

The City argues that LeRoy's application to register the
"Tavern on the Green" for restaurant services contained knowing
misstatements and omissions.  The application claimed that the
mark "was first used in interstate commerce at least as early as
August 31, 1976."  (Application Oath at 1.)  LeRoy further
represented that:

> "[H]e believes said joint venture to be the owner of
> the mark sought to be registered; to the best of his
> knowledge and belief no other person, firm, corporation
> or association has the right to use said mark in
> commerce, either in the identical form or in such near
> resemblance thereto as to be likely . . . to cause
> confusion, to cause mistake, or to deceive[.]"

(Application Oath at 1-2.)  LeRoy did not, however, disclose the
1973 Agreement in his application to the PTO.  LeRoy was a
signatory of the 1973 Agreement, which describes the grant to
Debtors as a "license," requires the City's written approval to
change the name of the restaurant from "Tavern on the Green," and
contains provisions allowing the City to oversee its management.
The 1973 Agreement also discusses the transition of operations
from Restaurant Associates, Inc. to Debtors, and the 1976
Amendment requires the City to consider Debtors' financial

success in running the "Tavern on the Green" when it awards the succeeding license to the restaurant.

These facts show that LeRoy had acknowledged the City's right to the name in the 1973 Agreement and knew that his venture was merely a licensee taking over operations from the prior concessionaire.  LeRoy also knew that the first use in commerce of the name "Tavern on the Green" for the restaurant in Central Park near West 67th Street significantly predated Debtors' license.  LeRoy therefore knowingly misstated the date of first use in commerce in the registration application.  The facts further compel the inference that LeRoy attempted to mislead the PTO by stating that he believed that his joint venture owned the mark and that "to the best of his knowledge and belief no other person, firm, corporation or association has the right to use said mark in commerce."  These misrepresentations, along with LeRoy's failure to disclose the 1973 Agreement, bore directly on LeRoy's right to register the mark and were intended to affect the PTO's action on the application.  The undisputed facts show that LeRoy did not act with "uncompromising candor" before the PTO, but rather made deliberate misstatements and omissions which affected the PTO's decision to register the mark.

Even viewing the claim of fraud through the prism of the City's heightened evidentiary burden, the Debtors have adduced no

facts which would permit a reasonable fact finder to conclude that LeRoy's conduct was anything but a deliberate attempt to mislead the PTO.  That the 1973 Agreement is not explicitly labeled a trademark license agreement does not alter the fact that LeRoy acknowledged the City's right to the trade name "Tavern on the Green" in the Agreement and knew that his venture was merely one in a succession of operators of the restaurant. Accordingly, the undisputed facts establish that LeRoy deliberately attempted to mislead the PTO about his status as the licensee of "Tavern on the Green," and the Debtors' restaurant services mark must be canceled.

## IV.  The City's Claim of a False Connection With An Institution

Both parties seek summary judgment on the City's claim for cancellation of Debtors' restaurant services and oils marks for falsely suggesting a connection with an institution.  Because the City has shown that the Debtors' restaurant services mark was obtained fraudulently, I need not reach the issue with respect to that mark.  Neither party has proffered undisputed facts regarding the production and distribution of the Debtors' cooking oils and salad dressing products.  Accordingly, summary judgment is premature on this claim.

## V.  The City's Claim of Likelihood of Confusion

The City's final claim for relief is for cancellation of the Debtors' oils mark for likelihood of confusion with the City's trade name.  The factual record on this claim is almost entirely undeveloped, and the parties devote little argument to it in

their briefing.   Summary judgment is therefore premature on this claim.

## VI.  The Debtors' Defense of Laches

The Debtors raise the defense of laches as to each of the

City's claims.  However, the plain language of the Lanham Act,

codified at 15 U.S.C. § 1051 et seq., makes it clear that a claim

for cancellation based on fraud may be asserted at any time.

Section 1064 provides:

> "A petition to cancel a registration of a mark, stating
> the grounds relied upon, may, upon payment of the
> prescribed fee, be filed by any person who believes
> that he is or will be damaged . . . by the registration
> of a mark on the principal register established by this
> chapter . . .
>
> (3) At any time if . . . its registration was obtained
> fraudulently or contrary to the provisions of section
> 1054 of this title or of subsection (a), (b), or (c) of
> section 1052 of this title . . . ."

15 U.S.C. § 1064.  Although this section applies to proceedings

before the PTO, Section 1119 gives federal courts the authority

to cancel a registered mark in judicial proceedings involving

that mark.  15 U.S.C. § 1119.  Moreover, Section 1065 provides

that an otherwise incontestable mark may be challenged "on a

ground for which application to cancel may be filed at any time

under paragraphs (3) and (5) of section 1064 of this title."  15

U.S.C. § 1065.  Applying this statutory language, courts have

held that there is no time limit on the assertion of a claim for

cancellation of an otherwise incontestable mark for fraud.

Marshak v. Treadwell, 240 F.3d 184, 192-94 (3d Cir. 2001) ("[T]he

language of the Lanham Act makes it clear that a claim for cancellation of a mark based on fraudulent procurement and a defense to an otherwise incontestable mark on a similar ground may be asserted at any time."); see also Emmpresa Cubana del Tabaco v. Culbro Corp., 213 F. Supp. 2d 247, 266-67 (S.D.N.Y. 2002) ("[P]arties in a court proceeding cannot assert equitable defenses against cancellation claims asserted on the basis of abandonment or other enumerated grounds in § 1064 that allow filing 'at any time.'").  Accordingly, the Debtors may not maintain a defense of laches to the City's claim for cancellation of the restaurant services mark for fraud.[6]

Moreover, to assert an equitable defense such as laches, the Debtors must come before the court with clean hands.  See Eppendorf-Netheler-Hinz GmbH v. Nat'l Scientific Supply Co., Inc., 14 Fed. App'x 102, 105 (2d Cir. 2001) ("A party asserting an equitable defense such as laches must demonstrate that it comes before the court with clean hands.").  Because the Debtors'

---

[6] The same reasoning bars Debtors' defense of laches with respect to the City's petition for cancellation of the restaurant services mark for falsely suggesting a connection with an institution.  That claim may also be brought "at any time" pursuant to 15 U.S.C. § 1064(3).  The defense of laches does not apply to the City's petition for cancellation of the oils mark because it is asserted within five years from the date of registration.  15 U.S.C. § 1064(1).

restaurant services mark was obtained through fraud on the PTO, the Debtors fail to demonstrate clean hands.[7]

## CONCLUSION

For the foregoing reasons, the Debtors' motion for summary judgment is denied.  The City's motion for summary judgment on its first and second claims and the Debtors' claims is granted to the extent that the City has the right under New York law to the trade name "Tavern on the Green" for its historic restaurant in Central Park.  The Debtors' registration of "Tavern on the Green" for restaurant services is canceled for fraud.  The balance of the City's motion is denied as premature.


        SO ORDERED.

Date:     New York, New York
          March 10, 2010


                              S/_____
                                  MIRIAM GOLDMAN CEDARBAUM
                                  United States District Judge


_____

[7] The Debtors argue in a footnote that even if the City's motion for summary judgment is granted, the Debtors are entitled to a trial on their First (standing), Third (acquiescence), Fourth (equitable estoppel), and Eighth (abandonment) affirmative defenses.  But, each of these "defenses" has been resolved against the Debtors on the undisputed facts.  The undisputed facts showing the City's prior right also establish the City's standing and refute abandonment of the trade name "Tavern on the Green."  The undisputed facts showing fraud bar the Debtors' equitable defenses.